**CONTINENTAL CASUALTY COMPANY,**
Appellant,

v.

**James A. JACKSON and William R. Jackson, by His Brother and Next Friend, James A. Jackson, Appellees.**

No. 18903.

United States Court of Appeals
Eighth Circuit.

Aug. 12, 1968.

John A. Blanchard, of Hurlburt, Blanchard, Cless & Porter, Des Moines, Iowa, for appellant; Philip H. Cless, Des Moines, Iowa, on the brief.

Max Putnam, Des Moines, Iowa, for appellees.

Before VOGEL, Senior Circuit Judge, LAY, Circuit Judge, and BECKER, Chief District Judge.

LAY, Circuit Judge.

The Continental Casualty Company appeals after a denial of its motion for judgment notwithstanding verdict and for a new trial after an unfavorable verdict was rendered against it on an accidental death policy. The plaintiffs are beneficiaries of the insured, Robert D. Jackson, deceased. On February 6, 1965, the decedent-insured was stricken with a heart attack after assisting in the manual carriage of one Herman F. Anderson, his father-in-law, from the bathroom to the den of the Anderson residence. At the time of his death the insured was a Judge of the Iowa District Court in Des Moines, Iowa. The decedent, Judge Robert D. Jackson, was hospitalized on the same day and died on February 18, 1965, as a result of a myocardial infarction.

The accidental death policy in question insures against "bodily injury caused by an accident occurring while this policy is in force and resulting directly and independently of all other causes in loss covered by this policy." The jury found that the death of the decedent was caused by an "accident" within the meaning of the policy and awarded a verdict for the full coverage. Continental Casualty Company brings this appeal on the grounds:

1. That there was insufficient evidence to sustain a finding of liability under the policy

(a) in that the decedent was not the victim of an "accident" because he was engaged in a voluntary act at the time of his heart attack, and

(b) in that the decedent's death did not result "directly and independently of all other causes of loss covered by this policy."

2. The defendant also requests a new trial alleging that the court erred in admitting certain evidence.

We affirm.

It is stipulated that the policy is to be interpreted and governed by Iowa law.

The facts briefly summarized show that decedent's father-in-law, Herman Anderson, became sick and disabled as he was getting out of his car. He later recovered. He was assisted by an Emil Carlson into his house to the bathroom. A short time later Mr. Anderson called for help as he could not get up from the toilet stool. Judge Jackson and his son, William Jackson, age 19, were summoned and arrived some ten or fifteen minutes later. The three men decided to carry Mr. Anderson from the bathroom to the den and place him upon a couch. Carlson held Anderson around the shoulders beneath the armpit, William Jackson took a position at the midsection area and the decedent lifted his thighs and ankles. William Jackson stated that the three of them lifted Mr. Anderson from the toilet stool, prying his hand off the seat itself and his one leg or foot from the lavatory support. The testimony shows that in the process of the carriage Herman Anderson grabbed onto the bathroom door frame and various objects while he was being removed. Mr. Anderson also placed his hands against the wall and throughout the carriage was "completely uncooperative." William Jackson asked him not to grab onto these things but he continued to do so. Herman Anderson himself testified that he did not remember any of the events which had transpired and that he thought he had been unconscious. The testimony is that as Mr. Anderson grabbed onto the various objects and walls, he disrupted the carriage and caused a jerking motion. This testimony demonstrates that there was an unusual strain placed upon the various parties throughout their movements in carrying Mr. Anderson. William Jackson testified that the jerking motion tended to stop them "just like box cars hitting together."

This testimony was stricken by the trial court, but the testimony that there was a jerking motion throughout their movements remained.

The evidence established that the decedent had had no symptoms of prior heart trouble. Shortly after carrying Mr. Anderson, the decedent experienced severe chest pain and was thereafter admitted to the hospital. He suffered a "coronary artery occlusion" with resultant myocardial damage. Twelve days later he died. His family doctor, Dr. Anderson, and a specialist in internal medicine, Dr. Chambers, both testified that the "probable cause of the myocardial infarction * * * was the heavy lifting previous to the chest pain." The evidence shows that when an "infarction" occurs, the heart muscle is damaged because a blood clot occurs depriving the muscle of proper circulation. Dr. Chambers specifically related causation to a "serious strain," pain and the shock which occurred. Dr. Chambers made a finding of coronary artery disease, which he indicated was a generic term covering coronary occlusion. He added, "quite usually" infarction was just the end result of arteriosclerosis. The underlying cause is coronary heart disease. However, Dr. Chambers specifically stated on cross-examination that he did not find that the decedent had arteriosclerotic disease. No autopsy was performed. He stated that "an excessive strain which causes a greater demand on the heart muscle than it normally is expected to produce may cause * * * the process * * * described as myocardial infarction."

Dr. Chambers related the strain to the "timing" and added "he might have lived longer under better circumstances with the same amount of coronary artery disease." He stated that in his experience he has never seen a case which did not have an underlying disease as the functioning cause. And finally, Dr. Chambers added that in his opinion *the strain* combined with the disease to produce the occlusion which then resulted in the infarction. He described the

"strain" as the "provocative" cause. The defendant called two heart specialists. Both doctors in substance related that extraordinary physical strain can initiate events leading to a myocardial infarction but that the major contributing cause of Judge Jackson's death was the arteriosclerotic condition of his arteries.

## THE "ACCIDENT" QUESTION

■ The trial court instructed the jury as to the definition of accident:

"The word 'accident' as used in this case means happening by chance, unexpectedly taking place, not according to the usual course of things.

"You are instructed in this regard that if the insured does a voluntary act, the natural and usual, and to be expected result of which is to bring injury upon himself, then a death so occurring is not an accident. But if the insured does a voluntary act, without knowledge or reasonable expecta-

tion that the result thereof will be to bring injury upon himself from which death may follow, then a bodily injury resulting in death is caused by an accident."

We think this instruction clearly reflects proper definition under Iowa law. Cf. Poweshiek County Nat'l Bank v. Nationwide Mut. Ins. Co., 156 N.W.2d 671, 679 (Iowa 1968). Defendant filed an exception to the court's instruction in that it failed to instruct in order to be an "accident" something "unforeseen, unexpected or unusual must occur in the act which precedes the injury." But this request does not accurately reflect Iowa law. See Comfort v. Continental Cas. Co., 239 Iowa 1206, 34 N.W.2d 588, 590 (1948).[1] We find no error in the court's instruction defining the meaning of "accident" under Iowa law.

On rehearing[2] the Iowa Supreme Court in Lickleider v. Iowa State Travel-

1. The defendant erroneously relies on Feder v. Iowa State Traveling Men's Ass'n, 107 Iowa 538, 78 N.W. 252 (1899) and other Iowa cases which distinguished between "accidental results" and "accidental means." This rule was modified by later cases which recognized that the two elements are somewhat identical, and proof of one may be considered to be proof of the other. See Dawson v. Bankers' Life Co., 216 Iowa 586, 247 N.W. 279, 282 (1943); Miser v. Iowa State Traveling Men's Ass'n, 223 Iowa 662, 273 N.W. 155 (1937).

2. The Lickleider case had an unusual history in the Iowa courts. Originally, the facts presented were held not to be sufficient to prove an accident, and the case was dismissed. See 151 N.W. 479 (1915). Then in 166 N.W. 363, upon rehearing, the decision was reversed. However, this was modified again on rehearing as follows:

"A petition for rehearing has been submitted in the above-entitled case, and, upon further consideration thereof, it is ordered that all that portion of the opinion filed therein beginning with and following the sentence, 'When a person engaged in some act or work of an ordinary and legitimate character is by some unforeseen and unexpected, or perhaps inexplicable, chance or con-

tingency subjected to injury or death, it savors strongly of the absurd to say that the cause which produced this result was not accidental, but his own voluntary act,' be withdrawn, and that in lieu thereof the following be substituted:

"It is manifest, from what we have said, that the injury was accidental. To come within the terms of the policy, such accident must have been external and violent. Myrtle Caldwell was asked on cross-examination: 'Did you not notice Mr. Dunbar slip, did you? A. Only when the tire came off. It came off suddenly with a jerk.' If then Dunbar in pulling the tire from the wheel slipped as might be found from this testimony, and fell in consequence thereof, the jury might have concluded, not only that the injury was accidental, but that it was due to slipping as the wheel came off, and that this was accidental means. No argument is required to demonstrate that such means might have been found external and violent. For the reason stated, we are of the opinion that the trial court erred in directing a verdict, and the judgment is reversed.

"The reporter in publishing will correct the opinion accordingly." Lickleider v. Iowa State Traveling Men's Ass'n, 168 N.W. 884 (1918).

ing Men's Ass'n, 184 Iowa 423, 166 N.W. 363, 367 (1918) quoted with approval from an 1898 Eighth Circuit opinion. The Iowa Supreme Court said:

"The rule, clearly deducible from the overwhelming weight of authority, is that when injury or death follows or results from a voluntary act of the insured, and the act is one which is not manifestly dangerous, but which is ordinarily done or performed without serious consequences to the doer, such result is caused by accidental means. This is nowhere better stated than by Sanborn, J., in [Western Commercial Travelers] Association v. Smith, 85 Fed. 401, 29 C.C.A. 223, 40 L.R.A. 653, where he says:

" 'An effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and * * * cannot be charged with the design of producing, * * * is produced by accidental means.' "

See also Comfort v. Continental Cas. Co., supra. In *Lickleider* the insured had experienced an excessive strain in "jerking" off a tire casing. The court held these facts to be sufficient to submit to a jury to determine whether an "accident" had occurred within the meaning of the policy. The Iowa Supreme Court relied upon the early decision of the United States Supreme Court in United States Mut. Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60 (1889), stating:

"There Dr. Barry, with two or three companions, in leaving a railway station platform jumped to the ground below, a distance of four or five feet. His act was perfectly voluntary, but in some way not shown by any direct proof he sustained a jar which it was claimed caused an injury to his bowels, resulting in his death, and although there was no evidence by any witness that he was seen to slip or fall, or that he alighted in any other manner than he intended, it was held that the jury were at liberty to find that by some unexpected or unforeseen or involuntary movement of his body in his descent from the platform to the ground the injury was caused. The Supreme Court also examined and approved an instruction to the jury to the effect that while if Barry jumped and alighted just as he intended, and nothing unforeseen, unexpected, or involuntary occurred affecting his movement or causing him to strike the ground in any different way than he intended, then his injury was not caused by accidental means; but if 'there occurred from any cause any unforeseen or involuntary movement, turn, or strain of the body which brought about the injury, or if there occurred any unforeseen circumstance which interfered with or changed such a downward movement as he intended to make, or as it would be natural to expect under such circumstances, and injury resulted therefrom, the injury would be attributable to accidental means.' If this be good law (and the eminence of the court pronouncing it commands our respect), then the case at bar was one for a jury." 166 N.W. at 366–67.

See also Budde v. National Travelers' Ben. Ass'n, 184 Iowa 1219, 169 N.W. 766 (1918) (excessive strain carrying heavy load of ashes),[3] and Annot. 56 A.L.R.2d 796.

■ In the instant case, we feel the trial court's submission to the jury of the "accident" question was proper under Iowa law.

### CAUSATION

The primary error alleged by the defendant is that the insured's death did not result solely from accidental injuries. The defendant asserts that for coverage to exist plaintiff must prove that the death was directly caused by the accident alone and was independent of all other causes.

---

3. After retrial on remand a verdict for plaintiff was affirmed by an evenly divided court, 181 N.W. 388 (Iowa 1921).

Defendant asserts that if any disease contributed to the insured's death, there cannot be any recovery under the policy. The Iowa Supreme Court has faced this precise problem on many occasions.

In Delaney v. Modern Acc. Club, 121 Iowa 528, 97 N.W. 91 (1903) recovery was allowed since a wound caused the disease, to-wit, blood poisoning. However, the court said in dicta:

"If Delaney, in the case before us, had been suffering from erysipelas, or some other disease, at the time he received the injury on his finger, and it appeared that the wound was more dangerous on that account, or that his previous diseased condition contributed to and augmented the danger from the wound, then, under the cases last cited, it might well be argued that, within the language of the certificate, his death did not 'result solely from accidental injuries.'" Id. at 95.

To the same effect, see Keen v. Continental Cas. Co., 175 Iowa 513, 154 N.W. 409 (1915); Vernon v. Iowa State Traveling Men's Ass'n, 158 Iowa 597, 138 N.W. 696 (1912).

In Binder v. National Masonic Accident Ass'n, 127 Iowa 25, 102 N.W. 190 (1905), citing Delaney, a plaintiff with a diseased condition of the arteries was denied recovery under an accident policy when he allegedly fell in a bathtub and ruptured an artery. However, it is significant that under the terms of the policy liability was denied if the injury was "directly or indirectly, wholly or in part, because of or resulting in or from any disease or bodily infirmity." (Emphasis ours.) The trial court instructed:

"[I]f Mr. Haverstock sustained a fall, and if the bursting of the artery was caused thereby, the plaintiff would be entitled to recover, even though it was found that the artery was in a weakened condition by reason of disease." 102 N.W. at 194.

The Iowa Supreme Court held this was error, since the express terms of the contract excluded it.

In Michener v. Fidelity & Cas. Co. of New York, 200 Iowa 476, 203 N.W. 14 (1925), having the same exclusionary policy terms with respect to "disease", the court relies upon Binder in denying recovery since the plaintiff proved nothing more than an aggravation of a prior disease.

Other Iowa cases (one very recent) clearly sustain the propriety of submitting the question of causation to the jury under the facts and terms of the policy existing here. See Poweshiek County Nat'l Bank v. Nationwide Mut. Ins. Co., (Feb. 6, 1968) supra; Lickleider v. Iowa State Traveling Men's Ass'n, supra; and cf. Watters v. Iowa State Traveling Men's Ass'n, 246 Iowa 770, 69 N.W.2d 1 (1955).[4]

The defendant excepted to the trial court's instruction on causation, which reads as follows:

"The insurance policy in question states that death must be caused by accident and result directly and independently of all other causes.

"Direct cause means the moving or precipitating cause. A disease or condition may contribute to death from a medical standpoint or as a remote cause; but if this factor would not apart from the accident, if any you find, have caused the death, then and in that event, the disease would not be the moving or precipitating cause of the death.

---

4. The plaintiff urges that Watters make exceptions for heart cases. However, Watters involved a traumatic injury to the heart resulting from crushed ribs causing the myocardial infarction. The coexistence of arteriosclerotic disease was not related as a causal factor. But cf., this court's reasoning in a pre-Erie case, where arteriosclerosis was held not to be a "disease" under the policy if it was not too far advanced. This court felt this question deserved special instruction and reversed. See Preferred Accident Ins. Co. of New York v. Combs, 76 F.2d 775 (8 Cir. 1935) (excluded: death "caused directly or indirectly by disease in any form").

"Independently of all other causes means independent of any other cause which would have apart from any accident have caused the death.

"An accident may be a direct cause of death even though the accident aggravated a disease or condition which then contributed to the death if that disease or condition would not without the accident have produced the death at that time.

"In that case, you are further told that if you find that the sole and direct cause of the death of Robert D. Jackson was due to disease, then there can be no recovery for the plaintiffs."

This instruction, although not using the words "proximate cause" is essentially the definition of proximate cause that is generally found applicable to "accident" policies with language identical to the terms involved in the present case. See Couch, Insurance 2d § 41:380 (1962). The significance of the *Binder* decision, supra, may be that different rules exist where a specific exclusion or exception to "disease" is provided within the policy. See also Poweshiek County Nat'l Bank v. Nationwide Mut. Ins. Co., supra, 156 N.W.2d at 680.[5] We need not decide this since there is not any exclusionary clause as to disease involved here; the language of the policy in the instant case is identical to that explored within the recent *Poweshiek* case.

The early case of Delaney v. Modern Acc. Club, supra, although factually distinguishable, lends authority to the common sense rule that where a party is suffering from a preexisting disease and the accident occurs thereafter, even though the disease itself may have had some contributing *remote* role in the death, nevertheless, such a disease is only a condition and not the proximate cause of death.[6] The "proximate cause" rule is generally derived from the Massachusetts rule found in Freeman v. Mercantile Mut. Ass'n, 156 Mass. 351, 30 N.E. 1013 quoted with approval by the Iowa Court in Delaney v. Modern Acc. Club, supra, 97 N.W. at 94:

" 'The principal question in the case is, what kind of cause is to be deemed 'proximate,' within the meaning of the policy? Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly to be considered the cause; and, in dealing with such cases, the maxim, 'Causa proxima non remota spectatur,' is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is necessarily to be deemed the proximate cause. It means that the law will not go further back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause of causes, beyond seeking the efficient, predominant cause, which, following it no further than those consequences that might have been antici-

5. The Iowa cases indicate if there exists an exclusionary clause, this becomes an affirmative defense and the defendant must assume the burden of proof thereunder. Even when there is evidence of some preexisting disease, if there is sufficient evidence to show that there was an accident, it is left to the jury to determine whether the accident was the cause or whether the disease was causal or contributory so as to exclude coverage. See Meyer v. Fidelity & Cas. Co., 96 Iowa 378, 65 N.W. 328 (1895). See also Lickleider v. Iowa State Traveling Men's Ass'n, supra, and Watters v. Iowa State Traveling Men's Ass'n, supra, 69 N.W.2d

at 12. It is made clear there that if the disease was only temporal or unexpected, the disorder was of a temporary character and not considered to be a contributory factor. 65 N.W. at 330.

6. In Cone v. Beneficial Standard Life Ins. Co., 388 F.2d 456, 460 (8 Cir. 1968), interpreting Missouri law, we quoted Prof. Prosser:
" 'The event without millions of causes is simply inconceivable; and causation alone can provide no clue of any kind to singling out those which are to be held legally responsible.' Prosser, Torts 243 (3d ed. 1964)."

pated as not unlikely to result from it, has produced the effect. *An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different.* * * * ' " [7] (Emphasis ours.)

In Lickleider v. Iowa State Traveling Men's Ass'n, supra, 166 N.W. at 365, the Iowa Supreme Court said:

"As we have seen, it is not open to doubt that the question whether he died of disease was for the jury. The only evidence tending to show that the death was the natural result of disease is that of the two physicians who express the opinion that he died of arteriosclerosis, which, as we understand it, is the technical term for hardening of the arteries, but this is met by other evidence that the sclerosis discovered in this case was such only as is ordinarily found in men of his size and age, and the weight and influence to be accorded to these conflicting opinions was for the jury. If the arteries of the deceased were sclerotic, but the sclerosis was such only as is the natural or usual accompaniment of increasing years, *the fact, if it be a fact, that a bodily injury sustained by him would more likely be fatal than would be the case if such condition did not exist would not prevent a recovery on the policy should it otherwise appear that the injury was of the nature or kind described in the contract.* Freeman v. [Mercantile Mutual] Association, 156 Mass. 351, 30 N.E. 1013, 17 L.R.A. 753." (Emphasis ours.)

Under the circumstances we find no error under Iowa law in the trial court's instruction on "causation" nor in the submission of the evidence to the jury.

## NEW TRIAL QUESTIONS

### A. Instructions.

■ The defendant insists that the trial court erred in refusing to give certain requested instructions. These requests concern defendant's disagreement with overall definitions of "accident" and "causation" submitted by the court. However, as indicated, we find no error in these instructions. Furthermore, due to its failure to object properly pursuant to Rule 51,[8] the defendant is estopped from claiming error in the refusal of the lower court to give its requested instructions. See Cone v. Beneficial Standard Life Ins. Co., 388 F.2d 456, 461 (8 Cir. 1968).

### B. "Hearsay" statement.

Defendant seeks a new trial alleging erroneous admission of the decedent's statement to his family doctor as to how the "accident" occurred. The trial court admitted this statement for purposes of "history" only, but later overruled defendant's objection in oral argument when plaintiff's counsel argued as to the truth of the facts the decedent had related to the physician.

■ We agree that ordinarily such statements would be inadmissible under the hearsay rule. Krug v. Mutual Benefit Health & Accident Ass'n, 120 F.2d 296 (8 Cir. 1941); London Guar. & Accid.

---

7. The rule is the same in Missouri. See Mutual Benefit Health & Accident Ass'n v. Francis, 148 F.2d 590 (8 Cir. 1945), where this court following Missouri law held:

"An injury which causes the death of a person in impaired health or suffering from disease is the cause of his death even though he would not have died if his health had not been impaired."

See also Fetter v. Fidelity & Cas. Co., 174 Mo. 256, 73 S.W. 592, 61 L.R.A. 459 (1903). The *Fetter* case is cited with approval in Lickleider v. Iowa State Traveling Men's Ass'n, supra, 166 N.W. at 367.

8. Rule 51 reads in part:

"No party may assign as error the giving *or the failure to give an instruction* unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis ours.) Fed.R.Civ.P. 51.

Co. v. Woelfle, 83 F.2d 325 (8 Cir. 1936). The Iowa Supreme Court has held that a physician's testimony concerning statements made by a patient to a doctor is admissible solely to allow the doctor to give the basis upon which his opinion is founded. However, such evidence cannot properly be used to prove the truth of the facts related by the patient to the doctor. See Schuler v. Cudahy Packing Co., 223 Iowa 1323, 275 N.W. 39 (1937); Poweshiek County Nat'l Bank v. Nationwide Mut. Ins. Co., supra. Even this rule limits the history to the event and not the details of causation. Poweshiek County Nat'l Bank v. Nationwide Mut. Ins. Co., supra. At best these facts in the ordinary case should be restricted to "history" and not as truth of the evidence asserted.

However, it is apparent that the statement is admissible under Iowa law for reasons constituting an exception to the hearsay rule. The doctor testified that the decedent gave him this history at approximately 5:00 p. m. The initial onset of symptoms occurred at approximately 4:00 p. m. When Dr. Anderson arrived, Judge Jackson was ashen gray, cold and still in shock. He was prostrate. Under these circumstances, even though the statement was made over an hour after the accident, such evidence is admissible as part of the res gestae under Iowa law. Cf. Stukas v. Warfield, Pratt, Howell Co., 188 Iowa 878, 175 N.W. 81 (1919); Califore v. Chicago, St. P., M. & O. Ry., 220 Iowa 676, 263 N.W. 29 (1935) and Watters v. Iowa State Traveling Men's Ass'n, supra. The Supreme Court of Iowa said in *Stukas*:

> "We have repeatedly said that the proper test of admissibility of such statements is whether they relate to the principal transaction and are explanatory of it and are made under such circumstances of excitement still continuing as to show they are spontaneous and not the result of deliberation or design. Within this general rule the admissibility of the declaration under the circumstances of the particular case is largely within the

discretion of the trial judge. The facts and circumstances of no two cases can be precisely alike and the exact length of time is not mathematically controlling." 175 N.W. at 84–85.

The fear of fabrication and unreliability of the decedent's version, related in the manner described, appears de minimus. Defendant's assertion that the statement was written up by the doctor many months later goes only to its weight and not its admissibility. We find no error in the court receiving the evidence and allowing the oral argument relating to it.

C. Mortality tables.

■ Plaintiff offered life expectancy tables theoretically to show the expectation of life of a man 59 years of age to be 16.09 years. Defendant objected that such evidence was irrelevant and immaterial to the issues in the case. We agree. The only issue being tried was whether decedent's death was caused by an accident. Plaintiff reasons that the tables show decedent would have lived a longer life but for the "accident." In other words, he would not have died of natural causes or disease at the age of 59 since he still had a life expectancy of sixteen years. We feel this is a complete non sequitur, and the evidence should have been excluded.

■ Life tables are generally admissible on a limited basis in wrongful death or damage actions for consideration of the probabilities of damage over a period of years. They in no way serve to show whether a person will or will not die by natural causes or otherwise at any particular age. Nor do they tend to prove probabilities of such. And even when life expectancy tables are received into evidence it has long been held the court should fully instruct the jury as to their limited use. See Scott v. Chicago, R. I. & P. Ry., 160 Iowa 306, 141 N.W. 1065 (1913).

However, we feel such evidence is harmless error and does not necessitate reversal. See Fed.R.Civ.P. 61. The relevant consideration is whether the evi-

dence is sufficient to cause reasonable jurors to change their minds and reach a different verdict. Although dealing with a criminal conviction, we think the principle of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is applicable to an objective decision here:

> "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." Id. at 765, 66 S.Ct. at 1248.

We fail to understand how this evidence could have even a "slight effect" upon the verdict.

Judgment affirmed.